UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| RICHARD J. LEVINE, AS TRUSTEE OF THE LEVINE/BERENSON TRUST, 2001 Union Street, Suite 200 San Francisco, CA 94123, | CASE NO. **FILED UNDER SEAL** **REDACTED PUBLIC VERSION** VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| Plaintiff, v. | |
| ROBERT G. KRAMER, SR. 6872 Oleander Lane Portage, MI 49024, | DEMAND FOR JURY TRIAL |
| SYED T. HUSAIN 21 Dahlia Court Piscataway, NJ 08854, | |
| ESTATE OF FUAD EL-HIBRI 13675 Vanderbilt Drive Naples, FL 34110, | |
| SUE BAILEY 8665 Bay Colony Drive Naples, FL 34108, | |
| ZSOLT HARSANYI 10928 Haven Park Circle Monrovia, MD 21770, | |
| RICHARD S. LINDAHL 108 E. Lenox Street Chevy Chase, MD 20815, | |
| ESTATE OF JEROME M. HAUER 7850 Southdown Road Alexandria, VA 22202, | |

1

GEORGE A. JOULWAN
2107 Arlington Ridge Road
Arlington, VA 22202,

RONALD B. RICHARD
2044 Random Road
Cleveland, OH 44106,

LOUIS W. SULLIVAN
5287 N. Power Ferry NW
Atlanta, GA 30327,

KATHRYN C. ZOON
9709 Culver Street
Kensington, MD 20895,

    Defendants,

-and-

EMERGENT BIOSOLUTIONS, INC.
400 Professional Drive, Suite 400
Gaithersburg, MD 20879,
A Delaware corporation,

    Nominal Defendant.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Richard J. Levine, as Trustee of the Levine/Berenson Trust, ("Plaintiff"), by through undersigned counsel, brings this action derivatively on behalf of nominal defendant Emergent BioSolutions Inc. ("Emergent" or the "Company") against certain of its directors and officers for breaches of their fiduciary duties. Plaintiff's allegations are made upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public documents, earnings conference calls, announcements made by

Emergent, Emergent's filings with the U.S. Securities and Exchange Commission ("SEC"), internal records produced to Plaintiff pursuant to 8 Del. Code Section 220 ("Section 220"), wire and press releases published by and regarding Emergent, legal filings, news reports, securities analyst reports and advisories about the Company, and other publicly available sources.

## NATURE OF THE ACTION

1. Emergent is a Delaware corporation headquartered in Gaithersburg, Maryland. Emergent is a global life sciences company. The Company's traditional main source of revenue was selling the anthrax vaccine to the U.S. government.

2. Among Emergent's primary business lines is Contract Development and Manufacturing, or CDMO, which includes producing substances for the mass deployment of vaccines. Emergent manages one of just three facilities in the country designated by the U.S. government to manufacture domestic supplies of vaccines for a public health emergency.

3. Beginning on April 23, 2020, in the early stages of the Covid-19 pandemic, Emergent signed lucrative deals with pharmaceutical companies Johnson & Johnson ("J&J") and AstraZeneca to produce Covid-19 vaccines at its Baltimore, Maryland manufacturing facility, named Bayview. Emergent touted these contracts and its ability to deliver on them.

4. However, unknown to investors and shareholders, Bayview had a history of internal control failures and was not anywhere close to prepared to handle the massive work required to manufacture vaccines for J&J and AstraZeneca.

5. Bayview's disastrous quality control problems caught up with Emergent quickly, culminating in widely-circulated March and April 2021 public reports that the Company had contaminated millions of doses of the new vaccines.

6.   In April 2021, as the adverse conditions at Bayview came to light, the U.S. government ordered J&J to take direct control of Bayview and prohibited Emergent from producing any of the AstraZeneca vaccine. A series of embarrassing revelations about Bayview followed, resulting in termination of the vaccine production contracts.

7.   In the run-up to these revelations, Emergent's stock price soared from approximately $60 pre-Covid to over $133 per share as the Company's prospects seemed bright with the Covid-19 pandemic at hand. During this period of rapid price accumulation, several high-level Emergent insiders, including its CEO and multiple directors, took full advantage and sold nearly $42 million of their Company stock at inflated prices. These sales were motivated in whole or in part by material adverse inside information regarding Bayview's adverse conditions.

8.   Beginning in April 2021, after the truth about Bayview was revealed and the stock price plummeted to pre-Covid levels, several class action lawsuits were filed against Emergent and certain of its executive officers in the U.S. District Court for the District of Maryland, alleging that the defendants aggressively promoted Emergent's Covid-19 contracts to investors while withholding critical information about the Company's pattern of poor quality control at Bayview, including the results of a devastating inspection by the U.S. Food and Drug Administration ("FDA") that occurred in April 2020.

9.   These lawsuits were consolidated under the caption *In Re Emergent BioSolutions Inc. Securities Litigation* (No. 8:21-cv-00955) (the "Securities Class Action"). The plaintiffs allege violations of federal securities laws under Section 10(b) (and Rule 10b-5) and Section 20(a) of the Securities Exchange Act of 1934 against defendants Emergent, Robert G. Kramer, Richard S. Lindahl, and Syed T. Husain, the Company's CEO, CFO, and former Senior Vice President of Contract Development and Manufacturing, respectively.

10. By order dated September 1, 2023, U.S. District Judge Deborah L. Boardman of this Court denied the defendants' motion to dismiss in the Securities Class Action, sustaining allegations that defendants made false and misleading statements to investors about Emergent's business and operations to investors with scienter, or intent to defraud, exposing the Company to massive liability to a class of Emergent stock purchasers between July 6, 2020 and May 19, 2021.

11. In addition to the Securities Class Action, the Company has become subject to several investigations by government agencies and Congressional committees, including (a) the SEC; (b) the U.S. Department of Justice ("DOJ"); (c) the Maryland Attorney General's Office; (d) the New York Attorney General's Office; (e) Representatives Carolyn Maloney and Jim Clyburn of the U.S. House Committee on Oversight and Reform and the Select Subcommittee on the Coronavirus Crisis; and (f) Senator Patty Murray of the U.S. Senate Committee on Health, Education, Labor and Pensions.

12. Shareholder value has been severely damaged by the misconduct of the Company's fiduciaries. The stock currently trades at less than $3 per share.

13. On July 20, 2022, Plaintiff made a litigation demand on the Emergent Board to pursue claims against the individuals responsible for exposing the Company to civil and regulatory liability, and for personally profiting off the inflated stock price by engaging in unlawful insider trading. See Exhibit A.

14. After a period of extensive delay, Plaintiff demanded action following Judge Boardman's September 1, 2023 order in the Securities Class Action.

15. As alleged herein, now, more than fifteen months after the initial demand, the Board has *still* failed to act on Emergent's obviously meritorious claims against its officers and directors, even as potential three-year statute of limitations defenses for the wrongdoers loom.

16. The Board's refusal to timely act was wrongful, requiring Plaintiff to file the instant complaint to protect and enforce the Company's claims.

## JURISDICTION AND VENUE

17. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18. This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Emergent maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in wrongful acts, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Emergent, occurred in this District; and (iv) defendants received substantial compensation in this District by doing business here and engaging in activities that had an effect in this District.

## PARTIES

### Plaintiff

20. Plaintiff is a current stockholder of Emergent. Plaintiff has continuously held Emergent common stock since 2011. Plaintiff is a citizen of New Mexico.

### Nominal Defendant Emergent

21. Emergent is a global life sciences company incorporated under the laws of Delaware. Its principal executive offices are at 400 Professional Drive, Suite 400, Gaithersburg,

Maryland 20879. Emergent's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EBS." Emergent is a citizen of Maryland.

**Individual Defendants**

22. Defendant Robert G. Kramer, Sr. has served as an Emergent director and as its President and CEO since April 2019. Prior to his current role, he served as Emergent's COO from March 2018 until March 2019. He served as Executive Vice President, Administration, CFO, and Treasurer from September 2012 until March 2018. Kramer joined Emergent as its CFO in 1999. Kramer received $5,569,978 in compensation for the fiscal year that ended December 31, 2020. This included $893,860 in salary, $2,050,007 in stock awards, $1,392,416 in option awards, $1,225,020 in non-equity incentive plan compensation, and $8,675 in all other compensation. Upon information and belief, Kramer is a citizen of Michigan.

23. Defendant Syed T. Husain served as the Emergent's Senior Vice President and Head of CDMO from 2019 until April 2021, when  it was announced he would be leaving the Company. Upon information and belief, Husain is a citizen of New Jersey.

24. The Estate of Fuad El-Hibri is named as a defendant in place of Fuad El-Hibri, who passed away on or about April 23, 2022. El-Hibri served as an Emergent director since 2004 and as Executive Chairman of the Board since April 2012. Prior to that, he served as Emergent's CEO and as Chairman of the Board from June 2004 until March 2012 and as President from March 2006 until April 2007. For the fiscal year that ended on December 31, 2020, El-Hibri received $3,213,484 in compensation. This included $1,192,202 in salary, $1,200,046 in stock awards, $815,051 in option awards, and $6,185 in all other compensation. Upon information and belief, the Estate of Fuad El-Hibri is a citizen of Florida.

25. Defendant Sue Bailey served as an Emergent director from June 2007 until May 2021. For the fiscal year that ended December 21, 2020, Defendant Bailey received $340,000 in compensation from Emergent. This included $90,000 in fees and $250,000 in stock awards. Upon information and belief, Bailey is a citizen of Florida.

26. Defendant Zsolt Harsanyi has served as an Emergent director since August 2004. For the fiscal year that ended on December 31, 2020, Harsanyi received $360,000 in compensation from Emergent. Upon information and belief, Harsanyi is a citizen of Maryland.

27. Defendant Richard S. Lindahl has served as the Company's Executive Vice President, CFO, and Treasurer since March 2018. For the fiscal year that ended December 31, 2020, Lindahl received $2,281,300 in compensation. This included $549,390 in salary, $749,998 in stock awards, $509,425 in option awards, $462,012 in non-equity incentive plan compensation and $10,475 in all other compensation. Upon information and belief, Lindahl is a citizen of Washington, District of Columbia.

28. The Estate of Jerome M. Hauer is named in place of Jerome M. Hauer, who passed away on or about August 11, 2023. Hauer served as an Emergent director since 2015. For the fiscal year that ended December 21, 2020, Hauer received $355,000 in compensation from Emergent. This included $105,000 in fees earned or paid in cash and $250,000 in stock awards. Upon information and belief, the Estate of Jerome M. Hauer is a citizen of Virginia.

29. Defendant George A. Joulwan served as an Emergent director from 2013 through 2023. For the fiscal year that ended December 21, 2020, Joulwan received $345,000 in compensation from Emergent. This included $95,000 in fees and $250,000 in stock awards. Upon information and belief, Joulwan is a citizen of Virginia.

30. Defendant Ronald B. Richard has served as an Emergent director since 2005. For the fiscal year that ended December 21, 2020, Richard received $390,000 in compensation from Emergent. This included $140,00 in fees and $250,000 in stock awards. Upon information and belief, Richard is a citizen of Ohio.

31. Defendant Louis W. Sullivan has served as an Emergent director since 2006. For the fiscal year that ended December 21, 2020, Sullivan received $355,000 in compensation from Emergent. This included $105,000 in fees earned or paid in cash and $250,000 in stock awards. Upon information and belief, Sullivan is a citizen of Georgia.

32. Defendant Kathryn Zoon has served as an Emergent director since 2016. For the fiscal year that ended December 21, 2020, Zoon received $345,000 in compensation from Emergent. This included $95,000 in fees earned or paid in cash and $250,000 in stock awards. Upon information and belief, Zoon is a citizen of Maryland.

33. The defendants identified in paragraphs 22 through 32 are sometimes referred to herein as the Individual Defendants.

34. Each Individual Defendant, by virtue of his or her management, executive, and/or directorship positions with Emergent, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts.

35. The Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial results of Emergent.

36. The Individual Defendants were required to supervise the preparation of Emergent's public filings and approve any reports, such as press releases and SEC filings, concerning Emergent's business and financial condition. The Individual Defendants were

prohibited from engaging in unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to Emergent.

37. Each Individual Defendant directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that misleading statements were being issued regarding the Company's operating performance and internal controls, and approved or ratified these statements.

38. Because of each Individual Defendant's positions with Emergent, each knew and had access to non-public information about the business of Emergent, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof, and reports and other information provided in connection therewith.

39. The Individual Defendants knew, or recklessly disregarded, that statements made about Emergent were false and misleading when made.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding the Company.

40. Because of their positions and access to material non-public information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, shareholders and investors, and that the positive representations that were being made were false and misleading.

41. Because of their positions of control and authority as directors and/or officers of Emergent, the Individual Defendants were able to and did, directly and/or indirectly, remain

informed as to the status of Emergent's operations, and upon receipt of notice or information of imprudent or unsound business practices, were required to make a reasonable inquiry, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws.

## SUBSTANTIVE ALLEGATIONS

### A.  Relevant Background of Emergent and Bayview.

42. Emergent develops, manufactures, and delivers medical countermeasures to address public health threats, including through the development and manufacturing of vaccines. Emergent's CDMO business unit provides development services, drug substance manufacturing, and drug product manufacturing and packaging.

43. These services are provided to other biopharmaceutical companies, government agencies, and non-government organizations, and employ five technology platforms (mammalian, microbial, viral, plasma, and gene therapy) in nine development and manufacturing facilities.

44. As the Company disclosed in its Form 10-K dated February 19, 2021: "Facilities involved in the manufacture and distribution of approved products are required to be registered with the [U.S. Food and Drug Administration ("FDA")] and certain state agencies and are subject to periodic unannounced inspections by the FDA for compliance with [current good manufacturing policies ("cGMP")] and other laws." Concerning vaccines, the Form 10-K noted that Emergent has "invested significant effort and financial resources in the development of our vaccines, therapeutics and medical device product candidates and the acquisition of additional product candidates[,]" but commercial success depends on the "successful development, formulation and cGMP scale-up of manufacturing that meets FDA or other foreign regulatory requirements."

45. Central to Emergent's CDMO business is the Bayview facility. Acquired in 2009, Bayview has served as a contract testing laboratory, performing analysis pursuant to established specifications and quality agreements on drug substance and drug product samples received from external sources and manufacturing sites. Bayview has both microbiology and biochemistry laboratories, and it performs research and development analyses.

46. Prior to the relevant period, Bayview underwent substantial reconstruction to improve its operating conditions. Emergent describes Bayview as one of just three facilities built with U.S. taxpayer support and designed by the U.S. government to support its national security and public health emergency needs. Indeed, to ensure a domestic supply of vaccines in a pandemic, Emergent was awarded a $163 million U.S. government contract on June 6, 2012, to ready Bayview for mass production in a crisis.

47. In early 2020, such a crisis materialized with the Covid-19 pandemic.

**B.   The Covid-19 Pandemic.**

48. In April 2020, Emergent entered into a technology transfer license agreement with Janssen Pharmaceuticals, Inc., one of the Janssen Pharmaceutical Companies of J&J, to provide manufacturing services in support of J&J's Covid-19 vaccine candidate. The deal was initially valued at $135 million and required Emergent to provide drug substance manufacturing services and to reserve large-scale manufacturing capacity for J&J.

49. Also in April 2020, the FDA inspected Bayview, finding numerous problems with its operation that needed to be corrected. The FDA provided a list of negative observations, including that (a) "[e]stablished specifications, test procedures and laboratory control mechanisms are not followed and documented at the time of performance"; (b) "[t]he responsibilities and procedures applicable to the quality control unit are not in writing and fully followed"; (c)

"[s]eparate or defined areas to prevent contamination or mix-ups are deficient regarding operations related to holding of rejected components before disposition"; and (d) "employees are not given training in the particular operations they perform as part of their function and current good manufacturing practices." Bayview was "not ready for commercial operations."

50. In May 2020, the U.S. government announced Operation Warp Speed, a public-private partnership between the U.S. Department of Health and Human Services ("HHS"), CDC, FDA, National Institutes of Health, the Biomedical Advanced Research and Development Authority ("BARDA"), and other federal agencies, the U.S. Department of Defense, and private pharmaceutical companies aimed at accelerating the development, manufacturing, and distribution of Covid-19 vaccines, therapeutics, and diagnostics.

51. On June 1, 2020, the U.S. government awarded Emergent an approximately $628 million contract to reserve manufacturing space and upgrade its facilities as part of Operation Warp Speed. This contract was one of the largest awards at the time, with *Bloomberg* calling Emergent "the ultimate Operation Warp Speed company."

52. On June 11, 2020, Emergent announced that it had signed a separate vaccine manufacturing agreement with AstraZeneca, initially valued at $87 million. Under this agreement, Emergent agreed to provide contract development and manufacturing services and large-scale manufacturing capacity through 2020 to support AstraZeneca's Covid-19 vaccine candidate.

53. On July 6, 2020, the Company announced that the J&J agreement had been expanded to cover five-years, valued at approximately $480 million over the first two years.

54. On July 27, 2020, the Company announced that the AstraZeneca agreement had been expanded to cover an additional year, valued at approximately $174 million through 2021.

55. Throughout the relevant period, Emergent touted its deals with J&J and AstraZeneca, explaining that Bayview was properly designed to handle rapid manufacturing in large quantities. Specifically, on July 6, 2020, Emergent issued a press release announcing the five-year expansion of the J&J agreement.

56. When announcing the new agreement, Kramer highlighted the Company's "manufacturing strength to address the Covid-19 pandemic." Husain added that Emergent had "the expertise and capabilities to meet the long-term needs of [its] customers and provide ongoing commercial manufacturing to benefit patients."

57. A few weeks later, on July 27, 2020, Emergent issued a press release announcing the expansion of the AstraZeneca agreement in which Husain boasted that "Emergent stands ready alongside leading innovators to rapidly deploy our [CDMO] services to help meet the substantial demand for a vaccine – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life."

58. Emergent continued to emphasize the Company's level of preparedness of its manufacturing facilities in the following weeks and months. For example, in a July 30, 2020 press release, Kramer stated that "Emergent is uniquely prepared to answer the call for [the] Covid-19 pandemic" with the Company's "proven manufacturing capabilities in place."

59. On September 14, 2020, Lindahl stated at a healthcare conference that J&J and AstraZeneca had chosen Emergent due to "the history we have of high quality manufacturing[;] of delivering on complex problems[;] of the fact that we had capacity available in the – primarily in the Bayview facility that we have, which was designed expressly for the purpose in partnership with the government of dealing with an emergency just like Covid."

14

60. At the same conference, Lindahl also stated that Emergent's manufacturing facilities can "handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now."

61. From November 2020 to at least February 2021, Emergent continued to describe its ability to "handle multiple products" and that the Company was "right on schedule" in its effort "to provide as many as 100 million doses to the U.S. government in the first half of 2021."

**C.  Bayview's Problems are Revealed.**

62. Despite publicly touting its manufacturing capacity and level of preparedness, Emergent's Bayview facility had a history of manufacturing problems, including longstanding contamination risks and quality control issues that led to string of FDA citations, which rendered the Company's campaign of statements about Bayview's capabilities a complete sham.

63. On March 31, 2021, *The New York Times* published an article reporting on the accidental contamination of the J&J and AstraZeneca Covid-19 vaccines at the facility. The article stated that in late February 2021, employees at Bayview "mixed up" ingredients of the two vaccines, contaminating up to 15 million doses of J&J's vaccine and forcing regulators to delay authorization of the plant's production lines.

64. The article also noted that the extensive vaccine contamination went undiscovered for multiple days until J&J's quality control checks finally uncovered it. In light of this, it became apparent that Emergent's ability to train and supervise its employees during the manufacturing process was in serious doubt. It was further revealed that this was not just an isolated incident but was part of a long-standing pattern of quality failures at Bayview.

65. On April 1, 2021, the *Associated Press* reported on Emergent's "history of violations," noting that the FDA had repeatedly cited Emergent for problems such as poorly trained

employees, cracked vials, and problems managing mold and other contamination. The article emphasized that the FDA's inspection of Bayview had faulted the Company for a series of quality control deficiencies and that it was not scaled to make drug substance for millions of vaccines.

66. On or around April 3, 2021, the U.S. government took the extraordinary action of putting J&J in charge of Bayview and prohibiting Emergent from producing the AstraZeneca vaccine to prevent any further cross-contamination.

67. Although the Company had touted its "unique" preparedness and "proven manufacturing capabilities," *The New York Times* called the "ingredient mix-up" and stripping of Emergent's control over its own plant "a significant setback and a public relations debacle."

68. Then, on April 6, 2021, *The New York Times* published another report citing undisclosed internal documents and interviews with current and former employees and federal officials that described Emergent as being ill-equipped to take on the important task of manufacturing COVID-19 vaccines—despite receiving a $163 million federal contract to improve its facilities and prepare for high-volume production.

69. Audits and investigations conducted in 2020 by J&J, AstraZeneca, two federal agencies, and the Company's own internal investigators, found that Emergent had not followed basic industry standards at Bayview and identified repeated shortcomings in efforts to disinfect and prevent contamination.

70. In particular, after a June 2020 audit conducted by J&J, J&J sent a report to Emergent that highlighted "weaknesses or gaps" in quality systems. J&J also noted that Emergent's virus contamination control strategy at Bayview was "deficient." Additionally, an audit conducted for AstraZeneca specifically highlighted a risk of viral cross-contamination, which experts believed was responsible for tainting the millions of doses of the J&J vaccine.

71. In the Company's own internal review in July 2020, Emergent's auditors found that errors occurring within Bayview "are not investigated to determine root cause, or are not investigated adequately." For instance, Emergent's auditors said mold had been repeatedly discovered in the room where cell cultures were grown, yet Emergent workers conducted "essentially no investigation" of this serious issue.

72. Additionally, Emergent's auditors noted that the flow of workers and materials at Bayview was not adequately controlled "to prevent mix-ups or contamination." In August 2020, another internal investigation found that Emergent approved four raw materials used to produce AstraZeneca's vaccine without fully testing them first. The report showed that Emergent's managers and supervisors often excused these deviations and justified violations because of the shortened production timelines required to meet Operation Warp Speed deadlines.

73. The April 6, 2021 *The New York Times* article also noted that the contaminated J&J vaccine was not the first time Emergent was forced to discard doses of a Covid-19 vaccine because of potential contamination. Between October 2020 and January 2021, Emergent threw away approximately five lots of the AstraZeneca vaccine—each lot the equivalent of two-to-three million doses—because of contamination or suspected contamination.

74. Additionally, in November 2020, production of a batch of the J&J vaccine was discarded after workers "hooked up" the wrong gas line and accidentally "suffocated" the cells where the virus for the vaccine was being grown. The next month, workers making AstraZeneca's vaccine deviated from manufacturing standards on average more than three times a day, and about one-fifth of the deviations were classified as "major."

75. *The New York Times* also reported that Carlo de Notaristefani, a manufacturing expert who had been overseeing production of Covid-19 vaccines for the federal government since

May 2020, issued a report in June 2020 concluding that Emergent lacked trained personnel and had a history of problems with quality control. Notaristefani noted that Emergent's staffing was "inadequate to enable the Company to manufacture at the required rate."

76. On April 19, 2021, the consequences of Emergent's deficiencies came into focus when Emergent announced that, "at the request of the FDA, Emergent agreed not to initiate the manufacturing of any new material at its Bayview facility and to quarantine existing material manufactured at the Bayview facility pending completion of the [FDA's] inspection and remediation of any resulting findings."

77. Then, on April 21, 2021, the FDA publicly released a Form 483 report detailing *nine* negative observations from its Bayview inspection, noting that the Company had "agreed to pause new production while it works with the FDA to resolve potential quality issues," and that the FDA would "not allow the release of any product until we feel confident that it meets our expectations for quality."

78. The April 21, 2021 Form 483 included the following top-line observations:

Observation 1: "Failure to conduct thorough investigations into unexplained discrepancies."

Observation 2: "The building used for the manufacture of the client [redacted] viral vaccine drug substance and client [redacted] viral vaccine drug substance is not maintained in a clean and sanitary condition."

Observation 3: "The building used for the manufacture of the client [redacted] viral vaccine drug substance and client [redacted] viral vaccine drug substance is not of suitable size, design, and location to facilitate cleaning, maintenance, and proper operations."

Observation 4: "Written production and process control procedures to prevent cross-contamination are not followed in the execution of

production and process control functions and are not documented at the time of performance."

Observation 5: "The components, product containers and/or closures were not handled and/or stored in a manner to prevent contamination." Observation 6: "Written procedures designed to assure that the drug substances manufactured in the facility have the identity, strength, quality, and purity they purport or are represented to possess are inadequate."

Observation 7: "Employees were not trained in the particular operation that they performed and/or in CGMPs related to their job function."

Observation 8: "Equipment used is not of adequate size to facilitate operations for its intended use or for cleaning and maintenance."

Observation 9: "Equipment and/or utensils are not cleaned and maintained at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug substance."

79. On April 29, 2021, shortly after receiving this disastrous inspection report, Kramer and Lindahl spoke on a conference call for Emergent's first quarter 2021 financial results, with Kramer taking full responsibility and promising swift action: "For things that we should have done differently, my leadership team and I bear full accountability. […] [Y]ou have my commitment that we're going to do everything we can to resolve these issues quickly and as safely as possible."

80. On April 30, 2021, Emergent submitted a 52-page response to the FDA in which it confirmed the cross-contamination problems and stated that the events had given Emergent a "renewed focus." Emergent also promised to implement—with J&J's help—a Quality Enhancement Plan ("QEP") to include certain "immediate actions," "interim controls," and "longer term improvements" in order to remediate these serious quality control deficiencies.

81. On June 11, 2021, *The New York Times* reported that, according to the FDA, ***60 million*** doses of the J&J vaccine manufactured at Bayview were discarded, with a further 10 million allowed to ship only with a "warning" that regulators could not guarantee they were produced with proper manufacturing practices.

82. Then, on June 18, 2021, *The New York Times* followed up with additional reporting that the problems at Bayview were so serious that more than ***100 million*** doses of the J&J and AstraZeneca vaccines remained in limbo while the FDA "[reviewed] records of virtually every batch that Emergent produced to determine if doses are safe."

83. Finally, on November 4, 2021, Emergent disclosed that HHS had terminated the Company's 2012 contract for public-private partnership for pandemic preparedness, including its lucrative "task order" for producing the J&J and AstraZeneca vaccines.

**D.** ███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████

███████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**E.  The Congressional Report.**

97. On May 10, 2022, U.S. Representatives Maloney and Clyburn issued a press release and report describing the results of their investigation into Emergent.

98.  According to Representative Maloney:

"Today's report shows that Emergent profited from the pandemic while violating the public's trust.  Despite major red flags at its vaccine manufacturing facility, Emergent's executives swept these problems under the rug and continued to rake in taxpayer dollars.  Ultimately, our report shows that Emergent's manufacturing failures and deceptive tactics led to the destruction of millions of doses of desperately needed vaccines.  Emergent's business practices are simply unacceptable, and I urge the federal government to carefully consider future contracts in light of Emergent's failures."

99.   Similarly, Representative Clyburn stated as follows:

"Today's staff report demonstrates how Emergent BioSolutions and its executives failed the American people through the contamination of hundreds of millions of desperately-needed vaccines at a pivotal point in the pandemic.  These doses were squandered despite repeated warnings from employees, outside consultants, pharmaceutical companies, and FDA regulators that the company's manufacturing practices were unsafe and that it was unlikely to fulfill the contract recklessly awarded by the Trump Administration.  Emergent executives prioritized profits over producing vaccines in a responsible manner that complied with FDA requirements. I commend the Biden Administration for terminating their contract following these unacceptable actions."

100. The press release summarized the report as follows:

**Nearly 400 million doses of coronavirus vaccines have been destroyed as a result of Emergent's failure to meet or maintain quality standards.** This includes millions of vaccine doses that were destroyed after FDA ordered a three-month halt of manufacturing activities between April and August 2021.

**Emergent hid evidence of contamination from government inspectors.**

-Immediately before an FDA site visit in February 2021, Emergent employees removed quality-assurance "hold tags" from Johnson & Johnson vaccine batches, which indicated that the containers had a potential quality issue.  An email obtained by the Committees states that the tags were removed **"to avoid drawing attention"** from FDA inspectors.

-New documents also show that Emergent personnel expressed concern that **HHS was "getting too involved"** following the company's cross-contamination of the Johnson & Johnson and AstraZeneca vaccines in March 2021.

**Emergent executives promoted the company's manufacturing capabilities despite being warned of severe deficiencies.**

-Documents obtained by the Committees reveal that before Emergent finalized manufacturing agreements with Johnson & Johnson and AstraZeneca, Emergent's then-Executive Vice President of Manufacturing and Technical Operations privately acknowledged that he had warned Emergent senior executives **"for a few years"** about the company's deficient quality systems, saying that **"room to improve is a huge understatement."**

-Despite these internal warnings, Emergent entered into contracts with Johnson & Johnson and AstraZeneca to manufacture coronavirus vaccines for $482 million and $174 million, respectively. Internal Emergent communications reveal that after manufacturing began, the Senior Director of Quality at the facility warned, **"Our risk is high!"** and, **"we lack commercial GMP [good manufacturing practices] compliance maturity."**

**FDA, Johnson & Johnson, and AstraZeneca identified multiple deficiencies at Bayview, which Emergent failed to remediate despite urgent warnings.**

-In July 2020, AstraZeneca personnel noted that they were **"concerned that the FDA observation was that Emergent isn't prepared for commercial manufacturing as things stand currently, and yet we will start commercial manufacture [sic] there very soon**."

-Internal Johnson & Johnson communications from October 2020 reveal that the Director of Regulatory Compliance warned it was "unclear" if the Emergent's Bayview site was ready to begin manufacturing and "effectively manage all the remediation efforts."

-An outside consultant to Emergent provided a stark warning in November 2020: **"I am stating very loudly that this work is NON-CGMP compliant. And a direct regulatory risk."**

**Inexperienced staff and high staff turnover at Emergent contributed to the vaccine contamination.**

-Emergent acknowledged in July and August 2020 that its staff were insufficiently trained, noting that **"most temporary employees [have] little or no pharmaceutical experience."**

-AstraZeneca concluded after visits to Bayview in November and December 2020 that **"poor cleaning was part of the root cause"** of the persistent contamination, which was corroborated by an Emergent executive, who asked in an internal email, **"When will all these trash going to be out of here? Trash are piling up."**

-FDA acknowledged during a staff briefing, **"Clearly, in retrospect, they hired a lot of individuals not as familiar with vaccine manufacturing, that did not have adequate training to do so."**

**Under the Biden Administration, HHS terminated its contract with Emergent because the company failed to follow federal manufacturing standards.**

-According to HHS, Emergent received $330 million in taxpayer dollars before the Biden Administration terminated the company's contract in November 2021. This **action saved taxpayers $320 million** that remained on the contract and came after the Committees launched an investigation and released preliminary findings about Emergent's troubling conduct.

[emphasis in original]

### F.  **The Securities Class Action.**

101. As alleged herein, on September 1, 2023, Judge Boardman denied Emergent's and certain other defendants' motion to dismiss the complaint in the Securities Class Action pending in this Court. The Court summarized the lead plaintiffs' allegations as follows:

> The Plaintiffs allege that throughout the Class Period, the Defendants were aware that severe and persistent deficiencies at the Bayview facility undermined Emergent's ability to produce large quantities of drug substance for two different clients at once; that these known problems were not disclosed to the public; and that the public statements that the Defendants did make were false and misleading (and drove up Emergent's stock price). They also allege that once news of contamination and other issues broke, the Defendants continued to make false and misleading public statements designed to reassure investors and mute the extent of Emergent's stock price decline.

102. The Court sustained the lead plaintiffs' claims for securities violations, which it characterized as the "business operations" fraud. According to the Court:

> The Plaintiffs allege that the Defendants engaged in a "business operations" fraud by misrepresenting Emergent's vaccine manufacturing capabilities, particularly its anti-contamination measures, with the requisite scienter. The "business operations" fraud section of the amended complaint identifies roughly sixty public press releases, reports, filings, presentations, and other announcements by the Defendants in which they allegedly made misstatements and omissions during the Class Period. ECF 54, ¶¶ 129–219. The Court finds the Plaintiffs plausibly allege that, beginning on July 6, 2020, the Defendants made, with the requisite scienter, material misstatements or omissions regarding Emergent's capabilities to undertake large-scale manufacturing at the Bayview facility. The Plaintiffs also plausibly allege that after news broke on March 31, 2021 of the contaminated J&J batch and continuing until May 19, 2021, the

Defendants made, with the requisite scienter, material misstatements or omissions regarding the scope of Bayview's contamination issues.

103. Significantly, the Court's analysis was supported by the accounts of certain confidential witnesses, which in turn are consistent with internal information known to the Board and management, as gleaned by Plaintiff from the Section 220 documents he obtained from the Company:

> The Plaintiffs identify ten confidential witnesses ("CWs") who observed and reported various deficiencies at Bayview. They include: (1) CW1, a Senior Project Manager at corporate headquarters from April to December 2020; (2) CW2, a Senior Program Manager, Operational Excellence from December 2018 to January 2021, then Director, Operational Excellence from January to December 2021, based at Bayview and other facilities; (3) CW3, a Quality Assurance Analyst at the Bayview facility from November 2020 to November 2021; (4) CW4, a Quality Control ("QC") Microbiology Analyst II at the Bayview facility from July 2019 to July 2020; (5) CW5, a Project Analyst at corporate headquarters from August 2020 to January 2021; (6) CW6, a QC Microbiology Specialist, Data Review Supervisor at the Bayview facility from October 2020 to May 2021; (7) CW7, a Lead QC Biological Laboratory Support Technician at the Bayview facility from March to October 2020; (8) CW8, a QC Supervisor at the Bayview facility from June to December 2020; (9) CW9, a Manufacturing Assistant and then Bioprocess Associate at the Bayview facility from July 2020 to October 2021; and (10) CW10, a QC Analyst II – Microbiology at the Bayview facility from April 2020 to May 2021.

> The CWs generally allege that when Emergent took on COVID-19 contracts in spring and early summer 2020, the Bayview facility did not have the properly trained personnel, equipment, quality control processes, physical space, or functional capability needed to handle the work—in short, that Emergent was unqualified and unprepared for mass production of vaccine drug substance. These deficiencies, the CWs allege, persisted throughout the Class Period.

104. Following an extensive analysis, the Court held that for the period July 6, 2020 through March 31, 2021, the lead plaintiffs adequately alleged that the defendants made false and misleading statements regarding Bayview's pre- and post- manufacturing capabilities, and that they made such statements with scienter, or intent to defraud investors.

105. In this regard, the Court held that Kramer's stock sales in particular of approximately $10 million were probative of his motive to commit securities fraud:

The insider trader allegations support a strong inference of scienter as to Kramer beginning in November 2020. According to the amended complaint, Kramer sold shares yielding over $1 million outside of any 10b5-1 plan and yielding over $10 million pursuant to his 10b5-1 plan, the latter of which occurred over three weeks in January to February 2021. These sales were suspicious in timing because they were made shortly after multiple batches were destroyed and around the same time as the alleged misstatements. They were suspicious in amount because Kramer's gross proceeds were 31 times larger than in the comparable pre-Class Period timeframe; because his 10b5-1 plan had never sold over $161,000 in any year from 2016 onward; and because the $8.61 million he reaped in net gains was far higher than his base salary in 2020 ($875,000) and 2021 ($1 million).

106. In sum, for the period July 6, 2020 through March 31, 2021, the Court held as

follows:

When viewed holistically, the Plaintiffs' allegations raise a strong inference that Emergent, Kramer, and Husain either knowingly or recklessly misled investors between July 6 and March 31. This inference is strengthened by the core operations doctrine. Under this doctrine, if a defendant's alleged misstatements are related to his company's core operations, he is more likely to have known that his statements were false. [citation omitted]. Thus, allegations that individual defendants were senior executives and that the relevant operations represented a core business of their company are relevant to a court's holistic scienter analysis, provided, of course, that they are accompanied by particularized allegations that a defendant was aware of problems in those operations. [citation omitted]. Husain and Kramer were senior executives at a biopharmaceutical company that contracted with the federal government and two pharmaceutical companies to manufacture drug substances for vaccines during the early days of the global pandemic. These executives repeatedly touted Emergent's ability to rapidly and on a large scale manufacture drug substances for COVID-19 vaccines. That their statements related to Emergent's core operations strengthens the inference of scienter. Viewed holistically, their statements and admissions, Kramer's alleged motives, the CW allegations, the FDA and other reports, the contemporaneous emails, and the ongoing batch destruction indicate that Kramer and Husain were aware of contamination problems and other significant deficiencies at Bayview.

This malicious inference is at least as compelling as any innocent inference, including the Defendants' suggested inference that Emergent "worked in good faith to manufacture vaccine drug substance in response to a pandemic, disclosed the risks, suffered an unfortunate contamination incident, and worked to address it." ECF 72-1, at 36. Emergent, Kramer, and Husain may well have been working in good faith to manufacture vaccine drug substance rapidly. But the Plaintiffs have raised a strong inference that while doing so, they omitted the

myriad known deficiencies at Bayview that undercut the success of that endeavor and did so with reckless disregard for how those omissions could mislead investors. The Plaintiffs' allegations raise a cogent and strong inference of scienter as to Kramer, Husain, and Emergent.

107. The Court went on to hold that, for the period from March 31, 2021 through May 19, 2021, the same defendants made false and misleading statements with scienter while trying to minimize the severity of the problems discovered at Bayview, including in Congressional testimony provided by Kramer:

> The Plaintiffs have plausibly alleged that Emergent's statements and Kramer's testimony that an isolated, "single batch" did not meet specifications were false. As of February 2021, Emergent had destroyed not just the February 2021 contaminated batch but also five AZ batches and an additional J&J batch due to contamination and other worker errors.

> The Plaintiffs also have plausibly alleged that Emergent's statements that the Bayview facility was "validated" to meet all current Good Manufacturing Practices, that its quality checks were "rigorous," or that those systems "worked as designed" were false. The CWs, FDA reports, and audits by J&J, AZ, BARDA, and Emergent indicate that quality control systems were deficient even before manufacturing began, and despite improvement attempts, Emergent failed to bring the Bayview facility into compliance with basic Current Good Manufacturing Practices.

108. The defendants in the Securities Class Action are set to answer the complaint on October 30, 2023.

## **INSIDER TRADING**

109. Between April 2020 and March 2021, as Emergent's stock price doubled, several high-level Emergent insiders made lucrative sales of Company stock while in possession of material adverse non-public information, including, among other things, information pertaining to Emergent's ability to manufacture large scale quantities of COVID-19 vaccines.

110. Based on a review of Form 4s filed with the SEC during the relevant period, Harsanyi, El-Hibri, Kramer, Bailey, Hauer, Joulwan, Richard, and Zoon (together, the "Selling Insiders") collectively made nearly $42 million in sales as set forth in the tables below:

**Fuad El-Hibri (Founder, Former Executive Chairman)**

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/29/20 | 20,000 | $74.24 | $1,484,800.00 |
| 4/30/20 | 20,000 | $74.01 | $1,480,200.00 |
| 9/9/20 | 20,000 | $102.80 | $2,056,000.00 |
| 9/10/20 | 20,000 | $102.66 | $2,053,200.00 |
| 9/16/20 | 20,000 | $102.48 | $2,049,600.00 |
| 9/17/20 | 20,000 | $100.68 | $2,013,600.00 |
| 9/23/20 | 13,000 | $100.58 | $1,307,540.00 |
| 9/24/20 | 12,535 | $98.85 | $1,239,084.75 |
| 11/2/20 | 20,000 | $90.44 | $1,808,800.00 |
| 11/3/20 | 20,000 | $90.74 | $1,814,800.00 |
| 11/9/20 | 20,000 | $95.26 | $1,905,200.00 |
| 11/10/20 | 19,391 | $88.21 | $1,710,480.11 |
| **Totals** | **224,926** | | **$20,923,304.86** |

**Robert G. Kramer (CEO, President, Director)**

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 1/15/21 | 19,026 | $106.0076 | $2,016,900.60 |
| 1/20/21 | 2,232 | $110.00 | $245,520.00 |
| 1/21/21 | 21,900 | $110.03 | $2,409,657.00 |
| 2/8/21 | 32,397 | $120.03 | $3,888,611.91 |
| 2/8/21 | 13,000 | $120.03 | $1,560,390.00 |

| Totals | 88,555 | | $10,121,079.51 |
|---|---|---|---|

### Sue Bailey (Former Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 6/3/20 | 5,322 | $87.503 | $465,690.97 |
| 8/18/20 | 4,665 | $128.3095 | $598,563.82 |
| 3/4/21 | 8,168 | $92.37 | $754,478.16 |
| Totals | 18,155 | | $1,818,732.95 |

### Zsolt Harsanyi (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/20 | 4,940 | $81.9888 | $405,024.67 |
| 8/17/20 | 6,609 | $133.71 | $883,664.28 |
| Totals | 11,549 | | $1,288,688.95 |

### Jerome M. Hauer (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/26/20 | 4,385 | $85.1478 | $373,373.10 |

### George A. Joulwan (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/20 | 2,000 | $85.1856 | $170,371.20 |
| 8/11/20 | 6,000 | $124.1059 | $744,635.40 |
| Totals | 8,000 | | $915,006.60 |

### Ronald B. Richard (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/27/20 | 7,893 | $78.00 | $615,654.00 |
| 5/5/20 | 8,375 | $80.1945 | $671,628.94 |
| 6/3/20 | 6,572 | $87.514 | $575,142.01 |
| 8/7/20 | 6,297 | $131.00 | $824,907.00 |
| **Totals** | **29,137** | | **$2,687,331.95** |

### Louis W. Sullivan (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 9/2/20 | 20,525 | $111.2157 | $2,282,702.24 |
| 9/2/20 | 7,893 | $111.2256 | $877,903.66 |
| **Totals** | **28,418** | | **$3,160,605.90** |

### Kathryn C. Zoon (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/12/20 | 1,660 | $85.2134 | $141,454.24 |
| 5/26/20 | 4,093 | $85.1019 | $348,322.08 |
| 8/10/20 | 1,000 | $130.27 | $130,270.00 |
| **Totals** | **6,753** | | **$620,046.32** |

111. At the times of these stock trades, the Selling Insiders were in possession of, and motivated in whole or in part by, material adverse non-public information, including, among other

things, information pertaining to Emergent's readiness to manufacture Covid-19 vaccines and the Company's longstanding pattern of quality control failures at the Bayview facility.

112. In denying the motion to dismiss in the Securities Class Action, Judge Boardman previously held that Kramer's insider trades supported an inference of his fraudulent intent.

## DAMAGES TO THE COMPANY

113. As a result of the Individual Defendants' misconduct, Emergent has incurred significant harm, including huge losses in shareholder value, as reflected by the stock price declines that occurred once the state of Bayview became known. The stock currently trades at less than $3 share. Emergent's disastrous Covid-19 episode has damaged the Company's reputation within the business community and in the capital markets.

114. As a direct result of the Individual Defendants' actions, Emergent has expended, and will continue to expend, significant sums of money.

115. Such expenditures include, but are not limited to: (a) costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; (b) costs incurred from reimbursements, penalties, or payments related to the contaminated vaccines or supplies alleged herein; and (c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Emergent; (d) massive expenses incurred in connection with the many regulatory and other investigations faced by the Company.

## DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

116. Plaintiff brings this action on behalf of Emergent to redress injuries suffered, and to be suffered, by Emergent as a direct result of violations of the breaches of fiduciary duty alleged herein. Emergent is named as a nominal defendant solely in a derivative capacity.

117. Plaintiff will adequately and fairly represent the interests of Emergent in enforcing and prosecuting its rights and has hired counsel experienced in shareholder litigation.

118. Plaintiff was a shareholder of Emergent at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current shareholder.

119. By letter dated July 20, 2022, Plaintiff made a demand on the Board to investigate and pursue legal remedies against all wrongdoers with responsibility for the Bayview disaster and the related fallout. See Exhibit A.

120. By letter dated September 27, 2022 from Emergent corporate counsel, Plaintiff was advised that the demand had been provided to the Board and that he would receive an update in "due course." See Exhibit B.

121. By letter dated December 21, 2022 from the same corporate counsel, Plaintiff was advised the Board believed "it would be prudent" to wait for a decision on the motion to dismiss then pending in the Securities Class Action, as described above, and that thereafter, the Board would "contact" Plaintiff concerning the demand. See Exhibit C.

122. On September 1, 2023, the Court issued the order denying the motion to dismiss, as alleged herein. Contrary to the December 21, 2022 letter, more than 30 days after the issuance of the opinion, Plaintiff was not contacted regarding the Board's process.

123. By letter dated October 4, 2023, Plaintiff therefore advised the Board that, based on Judge Boardman's order, the Company clearly had actionable claims against its officers and directors, that further delay was not acceptable, and that the Board needed to act immediately, and to so advise Plaintiff by October 13, 2023. See Exhibit D.

124. Plaintiff received only a meek response by email from outside counsel a few days later, stating that the issue was "before the board." See Exhibit E.

125. It is clear from Plaintiff's correspondence with the Board that the Board has failed to take the demand seriously and failed to timely pursue the issues raised in the demand, even as statute of limitations defenses for the wrongdoers loom, given that the first reports about Bayview's disastrous conditions came to light in March and April of 2021, almost three years ago.

126. No proactive steps have actually been taken by the Board, as evidenced by the Board's failure to timely communicate with Plaintiff.

127. The Board's failure to timely act on Plaintiff's demand was not an objective decision reached with due care, as the Board did not act independently, reasonably, nor in good faith, on the basis of all reasonably available information.

128. Rather, the Board has plainly disregarded the merits of the claims and allegations. Accordingly, the Board wrongfully refused Plaintiff's demand.

129. This refusal is demonstrably made in bad faith, is unfounded in law, and was not made independently on the basis of a good faith and reasonable investigation on the claims made in plaintiff's demand.

130. The Board's decision-making to date is not consistent with its obligation to determine in good faith whether the demand's claims have merit and whether it would be in the Company's best interests to pursue them.

131. Emergent's Board has shown itself post-demand to be so biased and lacking in independence that it cannot fairly address Plaintiff's demand, conduct any reasonable investigation into the wrongdoing, or remediate the wrongful conduct alleged.

132. In light of the Board's failure to act, as manifested by its failure to timely communicate with Plaintiff's counsel, Plaintiff commences this derivative action in order to

protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damages they have caused to Emergent.

133. Under these circumstances, plaintiff must act to prosecute the Company's claims.

## COUNT I

## BREACH OF FIDUCIARY DUTY

134. Plaintiff incorporates by reference the allegations set forth above.

135. Each of the Individual Defendants as current or former Emergent officers and/or directors, owe (or owed) the Company the fiduciary duties of care and loyalty.

136. By virtue of their positions as Emergent directors and/or officers, the Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein.

137. Each of them was required to: (a) use his or her ability to control and manage Emergent in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Emergent rather than his or her own interests.

138. The Individual Defendants violated their fiduciary duties of care and loyalty.

139. The Individual Defendants breached the duty of candor and disclosure by making false and misleading statements to shareholders.

140. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company. They intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Emergent.

141. The Individual Defendants breached their duties of care and loyalty by failing to exercise proper oversight over Emergent and its internal control practices and procedures.

142. The Individual Defendants knew of "red flags" regarding Bayview going back for years, and the decrepit state of Bayview's internal control environment, yet failed to take steps to remediate the problems notwithstanding being on notice of them.

143. Emergent has been injured by reason of the Individual Defendants' conduct.

## COUNT II

## UNJUST ENRICHMENT

144. Plaintiff incorporates by reference the allegations set forth above.

145. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense and to the detriment of Emergent.

146. The Individual Defendants were unjustly enriched as a result of the compensation and stock they received while breaching their fiduciary duties owed to the Company.

147. Plaintiff seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants.

148. Plaintiff, on behalf of Emergent, has no adequate remedy at law.

## COUNT III

## BROPHY CLAIM FOR INSIDER TRADING

149. Plaintiff incorporates by reference the  allegations set forth above.

150. At the time of the stock sales set forth herein, the Selling Insiders were in possession of material, adverse, non-public information and sold Emergent common stock based on such information.

151. The information described above was proprietary non-public information material to Emergent's business prospects and therefore its financial condition. It was a proprietary asset

belonging to the Company, which the Selling Insiders used for their own benefit when they sold Emergent common stock.

152. The Selling Insiders' sales of Emergent stock while in possession of materially adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith. Their sales were motived in whole or in part by the materially adverse, non-public information alleged herein.

153. Since the use of Emergent's proprietary information for their own gain constitutes a breach of the Selling Insiders' fiduciary duties to Emergent, Emergent is entitled to disgorgement of any profits made by the Selling Insiders (measured by the losses they avoided by trading upon such information).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring that the Individual Defendants breached their fiduciary duties to Emergent;

B.      Declaring that certain Individual Defendants were unjustly enriched;

C.      Declaring that the Selling Insiders engaged in unlawful insider trading;

D.      Declaring the rights of Emergent as against the Individual Defendants, that they be personally liable for all sums paid by Emergent in connection with the Securities Class Action litigation, whether in settlement or at trial, and for all other civil or regulatory liabilities incurred;

E.      Directing Emergent to take all necessary steps to improve its corporate governance and internal policies and procedures to comply with applicable laws:

F.      Entering judgment against the Individual Defendants and directing them to account to Emergent for all damages sustained by Emergent by reason of the wrongs alleged herein;

G.      Awarding Plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees and the reimbursement of expenses; and

H.      Granting such other and further relief as the Court may deem just and proper.


Dated: October 31, 2023

                                  The Kaplan Law Firm

                                  By: *Matthew B. Kaplan*
                                  Matthew B. Kaplan
                                  D. Md. Bar No. 18724
                                  1100 N Glebe Road, Suite 1010
                                  Arlington, VA 22201
                                  Mbkaplan@thekaplanlawfirm.com
                                  (703) 665-9529

                                  Robert C. Schubert (pro hac vice forthcoming)
                                  Willem F. Jonckheer (pro hac vice forthcoming)
                                  SCHUBERT JONCKHEER & KOLBE LLP
                                  2001 Union Street, Suite 200
                                  San Francisco, CA 94123
                                  rschubert@sjk.law
                                  wjonckheer@sjk.law
                                  (415) 788-4220

                                  *Counsel for Plaintiff*

Exhibit A

# SCHUBERT JONCKHEER & KOLBE LLP

————————————————————————— Attorneys at Law

Robert C. Schubert
Willem F. Jonckheer
Dustin L. Schubert
Noah M. Schubert

*Of Counsel*
Miranda P. Kolbe

Gregory T. Stuart

*VIA FEDEX*

July 20, 2022

Dr. Zsolt Harsanyi, Ph.D.
Chairman of the Board
Emergent BioSolutions Inc.
400 Professional Drive, Suite 400
Gaithersburg, MD 20879

   Re: *Demand on the Board of Directors to Investigate and Initiate Claims*

Dear Dr. Harsanyi:

   I write on behalf of Richard J. Levine as Trustee of the Levine/Berenson Trust, a beneficial owner of Emergent BioSolutions Inc. ("Emergent" or the "Company") common stock. Mr. Levine has continuously owned Emergent stock since June 29, 2011. Attached hereto as Exhibit A is a true and correct copy of the Trust's current brokerage account statement reflecting its beneficial ownership of Emergent common stock. With this letter, the Trust, through Mr. Levine, demands that the Company investigate and initiate claims against certain of Emergent's current and former officers and directors.

## I. **Background**

   As you know, Emergent is a Delaware global life sciences company that develops vaccines and antibody therapeutics for infectious diseases. The Company's traditional main source of revenue was selling the anthrax vaccine to the U.S. government. Beginning on April 23, 2020, in the early stages of the COVID-19 pandemic, Emergent signed lucrative deals with Johnson & Johnson ("J&J") and AstraZeneca to produce the two companies' COVID-19 vaccines at Emergent's Baltimore, Maryland manufacturing facility (the "Bayview Facility"). Emergent touted these deals, which sent the Company's stock soaring.

   However, the Company failed to disclose that the Bayview Facility had a history of internal control failures and was not prepared to handle the massive work required to manufacture vaccines for J&J and AstraZeneca. For instance, an FDA inspection cited the Company for failing to train employees "in the particular operations they perform as part of their function and current good manufacturing practices" and that the Company was not scaled for this type of operation.

These alleged quality control problems caught up with Emergent, culminating in widely-circulated March and April 2021 reports that the company had contaminated millions of doses of the vaccines. Furthermore, in early April 2021, the U.S. government ordered J&J to take direct control of the facility and prohibited Emergent from producing any of the AstraZeneca vaccine, stripping the company of a lucrative contract. During the same period when Emergent was touting its ability to produce the COVID-19 vaccines, several high-level Emergent insiders sold nearly $42 million of company stock at inflated prices.

Beginning in April 2021, several class action lawsuits were filed against Emergent and certain of its executive officers in the U.S. District Court for the District of Maryland, alleging the defendants aggressively touted these deals to investors while withholding critical information about the Company's pattern of poor quality control at the Bayview Facility, including the results of a devastating FDA inspection in April 2020. These lawsuits were consolidated under the caption *In Re Emergent Biosolutions Inc. Securities Litigation* (No. 8:21-cv-00955) (the "Securities Class Action"). The plaintiffs allege violations of federal securities laws under Section 10(b) (and Rule 10b-5) and Section 20(a) of the Securities Exchange Act of 1934 against defendants Emergent, Robert G. Kramer, Richard S. Lindahl, and Syed T. Husain, the Company's CEO, CFO, and former Senior Vice President of Contract Development and Manufacturing, respectively. The proposed class period runs from March 10, 2020 through November 4, 2021.

In addition to the Securities Class Action, the Company is also currently subject to several investigations by government agencies and Congressional committees, including (a) the U.S. Securities and Exchange Commission ("SEC"); (b) the U.S. Department of Justice ("DOJ"); (c) the Maryland Attorney General's Office; (d) the New York Attorney General's Office; (e) Representatives Carolyn Maloney and Jim Clyburn of the U.S. House Committee on Oversight and Reform and the Select Subcommittee on the Coronavirus Crisis; and (f) Senator Patty Murray of the U.S. Senate Committee on Health, Education, Labor and Pensions.

This litigation demand (the "Demand") concerns the subject matter at issue in the Securities Class Action and the several government inquires listed above, including potentially false and misleading statements regarding the Company's ability to manufacture COVID-19 vaccines at the Bayview Facility and suspicious insider stock sales by officers and directors.

## II.  Emergent Agrees to Provide Manufacturing Capabilities for COVID-19 Vaccines

According to the Company's website, Emergent develops, manufactures, and delivers medical countermeasures to address public health threats, including the development and manufacturing of vaccines. During the initial months of the COVID-19 pandemic, in April 2020, Emergent entered into a technology transfer license agreement with Janssen Pharmaceuticals, Inc., one of the Janssen Pharmaceutical Companies of J&J, to provide manufacturing services in support of J&J's COVID-19 vaccine candidate (the "J&J Agreement"). The deal was initially valued at $135 million and required Emergent to provide drug substance manufacturing services and to reserve large-scale manufacturing capacity for J&J. On July 6, 2020, the Company announced that

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 3 of 12

the J&J Agreement had been expanded to cover a five-year period, valued at approximately $480 million over the first two years.

On June 1, 2020, the U.S. government awarded Emergent an approximately $628 million contract to reserve manufacturing space and upgrade its facilities as part of Operation Warp Speed, the national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics. This contract was one of the largest awards at the time, with *Bloomberg* calling Emergent "the ultimate Operation Warp Speed company."

On June 11, 2020, Emergent announced that it had signed a separate vaccine manufacturing agreement with AstraZeneca, initially valued at $87 million (the "AstraZeneca Agreement"). Under this agreement, Emergent agreed to provide contract development and manufacturing services and large-scale manufacturing capacity through 2020 to support AstraZeneca's COVID-19 vaccine candidate. On July 27, 2020, the Company announced that the AstraZeneca Agreement had been expanded to cover an additional year, valued at approximately $174 million through 2021.

## III.    **Emergent's Representations Concerning the Bayview Facility**

Throughout the relevant period, Emergent touted its deals with J&J and AstraZeneca, explaining that the Company's Bayview Facility was properly designed to handle rapid manufacturing in large quantities. Specifically, on July 6, 2020, Emergent issued a press release announcing the five-year expansion of the J&J Agreement. When announcing the new agreement, Kramer highlighted the Company's "manufacturing strength to address the COVID-19 pandemic." Husain added that Emergent had "the expertise and capabilities to meet the long-term needs of [its] customers and provide ongoing commercial manufacturing to benefit patients."

A couple of weeks later, on July 27, 2020, Emergent issued a press release announcing the expansion of the AstraZeneca Agreement in which Husain boasted that "Emergent stands ready alongside leading innovators to rapidly deploy our [Contract Development and Manufacturing Organization ("CDMO")] services to help meet the substantial demand for a vaccine – anchored on our foundational expertise in development and manufacturing and propelled by our commitment to our mission – to protect and enhance life."

Emergent continued to tout the Company's level of preparedness of its manufacturing facilities in the following weeks and months. For example, in a July 30, 2020 press release, Kramer stated that "Emergent is uniquely prepared to answer the call for [the] COVID-19 pandemic" with the Company's "proven manufacturing capabilities in place."

On September 14, 2020, Lindahl stated at a healthcare conference that J&J and AstraZeneca had chosen Emergent due to "the history we have of high quality manufacturing[;] of delivering on complex problems[;] of the fact that we had capacity available in the – primarily in the Bayview facility that we have, which was designed expressly for the purpose in partnership with the government of dealing with an emergency just like COVID." At the same conference,

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 4 of 12

Lindahl also touted that Emergent's manufacturing facilities can "handle a different set of applications and be set up to move very rapidly, and that's exactly what we're doing right now." From November 2020 to at least February 2021, Emergent continued to boast about its ability to "handle multiple products" and that the Company was "right on schedule" in their effort "to provide as many as 100 million doses to the U.S. government in the first half of 2021."

## IV.    The Truth is Revealed

Despite publicly touting its manufacturing capacity and level of preparedness, Emergent's Bayview Facility had a history of manufacturing problems, including longstanding contamination risks and quality control issues that led to string of FDA citations. On March 31, 2021, *The New York Times* published an article reporting on the accidental contamination of the J&J and AstraZeneca COVID-19 vaccines at the facility. The article stated that in late February 2021, employees at the Bayview Facility "mixed up" ingredients of the two vaccines, contaminating up to 15 million doses of J&J's vaccine and forcing regulators to delay authorization of the plant's production lines. The article also noted that the extensive vaccine contamination went undiscovered for multiple days until J&J's quality control checks finally uncovered it.

In light of this, Emergent's ability to train and supervise its employees during the manufacturing process was in serious doubt. It was further revealed that this was not just an isolated incident but was part of a long-standing pattern of quality failures at the Bayview Facility. On April 1, 2021, the *Associated Press* reported on Emergent's "history of violations," noting that the FDA had repeatedly cited Emergent for problems such as poorly trained employees, cracked vials, and problems managing mold and other contamination. The *AP* article emphasized that the FDA's inspection of the Bayview Facility had faulted the Company for a series of quality control deficiencies and that the facility was not scaled to make drug substance for millions of vaccines.

On or around April 3, 2021, the U.S. government took the extraordinary action of putting J&J in charge of Emergent's Bayview Facility and prohibiting Emergent from producing the AstraZeneca vaccine to prevent any further cross-contamination. Although the Company had touted its "unique" preparedness and "proven manufacturing capabilities," *The New York Times* called the "ingredient mix-up" and stripping of Emergent's control over its own plant "a significant setback and a public relations debacle."

Then, on April 6, 2021, *The New York Times* published another report citing undisclosed internal documents and interviews with current and former employees and federal officials that described Emergent as being ill-equipped to take on the important task of manufacturing COVID-19 vaccines—despite receiving a $163 million federal contract to improve its facilities and prepare for high-volume production. Audits and investigations conducted in 2020 by J&J, AstraZeneca, two federal agencies, and the Company's own internal investigators, found that Emergent had not followed basic industry standards at its Bayview Facility and identified repeated shortcomings in efforts to disinfect and prevent contamination. In particular, after a June 2020 audit conducted by J&J, J&J sent a report to Emergent that highlighted "weaknesses or gaps" in the Company's quality systems. In its report, J&J also noted that Emergent's virus contamination control strategy at the

Bayview Facility was "deficient." Additionally, an audit conducted for AstraZeneca specifically highlighted a risk of viral cross-contamination, which experts believe was responsible for tainting the millions of doses of the J&J vaccine.

In the Company's own internal audit in July 2020, Emergent's auditors found that errors occurring within the Company "are not investigated to determine root cause, or are not investigated adequately." For instance, Emergent's auditors said mold had been repeatedly discovered in the room where cell cultures were grown, yet Emergent workers conducted "essentially no investigation" of this serious issue. Additionally, Emergent's auditors also noted that the flow of workers and materials at the Bayview Facility was not adequately controlled "to prevent mix-ups or contamination." In August 2020, another internal investigation found that Emergent approved four raw materials used to produce AstraZeneca's vaccine without fully testing them first. The report showed that Emergent's managers and supervisors often excused these deviations from standards and justified violations because of the shortened production timelines required to meet the needs of Operation Warp Speed.

The April 6, 2021 *The New York Times* article also noted that the contaminated J&J vaccine was not the first time Emergent was forced to discard doses of a COVID-19 vaccine because of potential contamination. Between October 2020 and January 2021, Emergent threw away approximately five lots of the AstraZeneca vaccine—each lot the equivalent of two-to-three million doses—because of contamination or suspected contamination. Additionally, in November 2020, production of a batch of the J&J vaccine was also discarded after workers "hooked up" the wrong gas line and accidentally "suffocated" the cells where the virus for the vaccine was being grown. The next month, workers making AstraZeneca's vaccine deviated from manufacturing standards on average more than three times a day, and about one-fifth of the deviations were classified as "major."

*The New York Times* also reported that Carlo de Notaristefani, a manufacturing expert who had been overseeing production of COVID-19 vaccines for the federal government since May 2020, issued a report in June 2020 concluding that Emergent lacked trained personnel and had a history of problems with quality control. Notaristefani noted that Emergent's staffing was "inadequate to enable the Company to manufacture at the required rate."

On April 19, 2021, the consequences of Emergent's deficiencies came into focus when Emergent announced that, "at the request of the FDA, Emergent agreed not to initiate the manufacturing of any new material at its Bayview facility and to quarantine existing material manufactured at the Bayview facility pending completion of the [FDA's] inspection and remediation of any resulting findings."

Then, on April 21, 2021, the FDA publicly released a Form 483 report detailing *nine* negative observations from its Bayview Facility inspection, noting that the Company had "agreed to pause new production while it works with the FDA to resolve potential quality issues," and that the FDA would "not allow the release of any product until we feel confident that it meets our

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 6 of 12

expectations for quality." The April 21, 2021 Form 483 included the following top-line observations:

- Observation 1: "Failure to conduct thorough investigations into unexplained discrepancies."
- Observation 2: "The building used for the manufacture of the client [redacted] viral vaccine drug substance and client [redacted] viral vaccine drug substance is not maintained in a clean and sanitary condition."
- Observation 3: "The building used for the manufacture of the client [redacted] viral vaccine drug substance and client [redacted] viral vaccine drug substance is not of suitable size, design, and location to facilitate cleaning, maintenance, and proper operations."
- Observation 4: "Written production and process control procedures to prevent cross-contamination are not followed in the execution of production and process control functions and are not documented at the time of performance."
- Observation 5: "The components, product containers and/or closures were not handled and/or stored in a manner to prevent contamination."
- Observation 6: "Written procedures designed to assure that the drug substances manufactured in the facility have the identity, strength, quality, and purity they purport or are represented to possess are inadequate."
- Observation 7: "Employees were not trained in the particular operation that they performed and/or in CGMPs related to their job function."
- Observation 8: "Equipment used is not of adequate size to facilitate operations for its intended use or for cleaning and maintenance."
- Observation 9: "Equipment and/or utensils are not cleaned and maintained at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug substance."

On April 29, 2021, shortly after receiving this disastrous inspection report, Mr. Kramer and Mr. Lindahl spoke on a conference call for Emergent's Q1 2021 financial results, with Mr. Kramer taking full responsibility for the compliance debacle and promising swift action: "For things that we should have done differently, my leadership team and I bear full accountability. [...] [Y]ou have my commitment that we're going to do everything we can to resolve these issues quickly and as safely as possible."

On April 30, 2021, Emergent submitted a 52-page response to the FDA in which it confirmed the cross-contamination problems and stated that the events had given the Company a "renewed focus." Emergent also promised to implement—with J&J's help—a Quality Enhancement Plan ("QEP") to include certain "immediate actions," "interim controls," and "longer term improvements" in order to remediate these serious quality control deficiencies.

On June 11, 2021, *The New York Times* reported that, according to the FDA, *60 million* doses of the J&J vaccine manufactured at the Bayview Facility were discarded, with a further 10

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 7 of 12

million allowed to ship only with a "warning" that regulators could not guarantee they were produced with proper manufacturing practices. Then, on June 18, 2021, *The New York Times* followed up with additional reporting that the problems at the Bayview Facility were so serious that more than *100 million* doses of the J&J and AstraZeneca vaccines remained in limbo while the FDA "[reviewed] records of virtually every batch that Emergent produced to determine if doses are safe."

Finally, on November 4, 2021, Emergent disclosed that the U.S. Department of Health and Human Services had terminated the Company's 2012 contract for public-private partnership for pandemic preparedness, including its lucrative "task order" for producing the J&J and AstraZeneca vaccines. That same day, Mr. Kramer disclosed that Mary Oates, the Company's Senior Vice President of Global Quality (who had been glowingly highlighted in Emergent's April 30, 2021 response to the FDA), had left the Company "to pursue a new career opportunity." Worse, Ms. Oates's apparently sudden departure left a leadership vacuum in her critical department, with Mr. Kramer noting that the Company was then still in the process of "conducting an external search for a new Head of Global Quality."

V.



Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 8 of 12



Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 9 of 12

## VI. Suspicious Insider Trading

Between April 2020 and March 2021, several high-level Emergent insiders may have made lucrative sales of Company stock while in possession of material adverse non-public information, including, among other things, information pertaining to Emergent's ability to manufacture large scale quantities of COVID-19 vaccines. Based on a review of Form 4s filed with the SEC during the relevant period, you, Fuad El-Hibri, Robert G. Kramer, Sue Bailey, Jerome M. Hauer, George A. Joulwan, Ronald B. Richard, and Kathryn C. Zoon (together, the "Selling Insiders") collectively made nearly $42 million in sales as set forth in the tables below:

### Fuad El-Hibri (Founder, Former Executive Chairman)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/29/20 | 20,000 | $74.24 | $1,484,800.00 |
| 4/30/20 | 20,000 | $74.01 | $1,480,200.00 |
| 9/9/20 | 20,000 | $102.80 | $2,056,000.00 |
| 9/10/20 | 20,000 | $102.66 | $2,053,200.00 |
| 9/16/20 | 20,000 | $102.48 | $2,049,600.00 |
| 9/17/20 | 20,000 | $100.68 | $2,013,600.00 |
| 9/23/20 | 13,000 | $100.58 | $1,307,540.00 |
| 9/24/20 | 12,535 | $98.85 | $1,239,084.75 |
| 11/2/20 | 20,000 | $90.44 | $1,808,800.00 |
| 11/3/20 | 20,000 | $90.74 | $1,814,800.00 |
| 11/9/20 | 20,000 | $95.26 | $1,905,200.00 |
| 11/10/20 | 19,391 | $88.21 | $1,710,480.11 |
| **Totals** | **224,926** | | **$20,923,304.86** |

### Robert G. Kramer (CEO, President, Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 1/15/21 | 19,026 | $106.0076 | $2,016,900.60 |
| 1/20/21 | 2,232 | $110.00 | $245,520.00 |
| 1/21/21 | 21,900 | $110.03 | $2,409,657.00 |
| 2/8/21 | 32,397 | $120.03 | $3,888,611.91 |
| 2/8/21 | 13,000 | $120.03 | $1,560,390.00 |
| **Totals** | **88,555** | | **$10,121,079.51** |

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 10 of 12

### Sue Bailey (Former Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 6/3/20 | 5,322 | $87.503 | $465,690.97 |
| 8/18/20 | 4,665 | $128.3095 | $598,563.82 |
| 3/4/21 | 8,168 | $92.37 | $754,478.16 |
| **Totals** | **18,155** | | **$1,818,732.95** |

### Zsolt Harsanyi (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/20 | 4,940 | $81.9888 | $405,024.67 |
| 8/17/20 | 6,609 | $133.71 | $883,664.28 |
| **Totals** | **11,549** | | **$1,288,688.95** |

### Jerome M. Hauer (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/26/20 | **4,385** | $85.1478 | **$373,373.10** |

### George A. Joulwan (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/20 | 2,000 | $85.1856 | $170,371.20 |
| 8/11/20 | 6,000 | $124.1059 | $744,635.40 |
| **Totals** | **8,000** | | **$915,006.60** |

### Ronald B. Richard (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/27/20 | 7,893 | $78.00 | $615,654.00 |
| 5/5/20 | 8,375 | $80.1945 | $671,628.94 |
| 6/3/20 | 6,572 | $87.514 | $575,142.01 |
| 8/7/20 | 6,297 | $131.00 | $824,907.00 |
| **Totals** | **29,137** | | **$2,687,331.95** |

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 11 of 12

### Louis W. Sullivan (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 9/2/20 | 20,525 | $111.2157 | $2,282,702.24 |
| 9/2/20 | 7,893 | $111.2256 | $877,903.66 |
| **Totals** | **28,418** | | **$3,160,605.90** |

### Kathryn C. Zoon (Director)

| Trade Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/12/20 | 1,660 | $85.2134 | $141,454.24 |
| 5/26/20 | 4,093 | $85.1019 | $348,322.08 |
| 8/10/20 | 1,000 | $130.27 | $130,270.00 |
| **Totals** | **6,753** | | **$620,046.32** |

At the times of these trades, the Selling Insiders were in possession of material adverse non-public information, including, among other things, information pertaining to Emergent's readiness to manufacture COVID-19 vaccines and the Company's longstanding pattern of quality control failures at the Bayview Facility.

## VII.    Demand for Litigation to Recover Corporate Losses

In light of the foregoing, Mr. Levine demands that the Emergent Board of Directors (the "Board") immediately investigate and pursue legal claims for breach of fiduciary duty (and any other claims) against the individuals responsible for the egregious and bad faith mismanagement described herein and for their self-enrichment in the form of unlawful insider trading proceeds and excess compensation, fees, bonuses, or other awards that they did not rightfully earn.

In addition to yourself, the Company must investigate and pursue legal claims against, at least, the following individuals: Sue Bailey, Fuad El-Hibri, Jerome M. Hauer, Syed T. Husain, George A. Joulwan, Robert G. Kramer, Richard S. Lindahl, Ronald B. Richard, and Kathryn C. Zoon, in addition to any and all other responsible current or former Emergent officers, directors, or employees, whether past or present, who served at the relevant time. The Board must also investigate any responsible third parties, including but not limited to legal and/or technical advisors.

The Board must also correct deficiencies in the Company's internal control environment and institute broad-based corporate governance improvements, including an overhaul of the Company's manufacturing, safety, and compliance practices.

The Board must undertake an investigation of the wrongdoing detailed herein by independent and disinterested directors with the assistance of independent outside legal counsel.

Dr. Zsolt Harsanyi, Ph.D.
July 20, 2022
Page 12 of 12

Following the investigation, Mr. Levine demands that the Company commence legal proceedings against each party identified by the investigation as being responsible for the mismanagement and other misconduct described herein. The legal proceedings should bring claims for breaches of fiduciary duty and indemnification and contribution, among other relevant and appropriate claims, and seek recovery for all of the harm caused to the Company arising out of its exposure to regulatory proceedings and private lawsuits, including all investigation and defense costs.

The legal proceedings should also seek recovery of salaries, bonuses, director remuneration, and other compensation paid to the parties responsible for the wrongdoing detailed herein because these parties were unjustly enriched by such payments.

The Board must commence these legal proceedings as expeditiously as possible, keeping in mind the relevant statute of limitations periods. Because of concern that the proceedings may not be able to be initiated prior to the expiration of the relevant statute of limitations, the Board should secure tolling agreements from all potential defendants, which will allow the Board to complete its investigation and pursue all appropriate legal remedies. To the extent that relevant statute of limitations periods expire prior to the Board commencing legal proceedings or obtaining tolling agreements, the Board must investigate and pursue claims for breaches of fiduciary duties and/or legal malpractice against those who allowed any statute of limitations periods to expire.

To conclude, Mr. Levine demands (a) that any and all claims arising out of these matters not be compromised absent a full investigation and documented findings; and (b) that he be kept fully apprised of and invited to participate in all discussions involving the resolution of any factually-related shareholder lawsuits, demands, or derivative claims.

If, within a reasonable time after receipt of this letter, the Board has not taken the action demanded herein, Mr. Levine reserves all rights to enforce the Company's claims.

Very truly yours,

*/s/ Willem F. Jonckheer*

Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP

Attachment

LEVINE/BERENSON TRUST
RICHARD J LEVINE TTEE
& ARLENE F BERENSON TTEE
U/A DTD 11-22-2021
JUNE 1, 2022 - JUNE 30, 2022
ACCOUNT NUMBER:

## Stocks, options & ETFs

**Stocks and ETFs continued**

| DESCRIPTION | QUANTITY | ADJ PRICE/ ORIG PRICE | ADJ COST/ ORIG COST | CURRENT PRICE | CURRENT MARKET VALUE | UNREALIZED GAIN/LOSS | ESTIMATED ANNUAL INCOME | ANNUAL YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| EMERGENT BIOSOLUTIONS INC EBS | | | | | | | | |
| Acquired 06/29/11 | 100 | 21.55 | 2,155.64 | 31.0400 | 3,104.00 | 948.36 | N/A | N/A |

Exhibit B

# EMERGENT

September 27, 2022

Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111

**Re**:    Shareholder Demand Pursuant to Del. Ct. Ch. R. 23.1

Dear Mr. Jonckheer,

I write to inform you that Emergent BioSolutions, Inc. ("the Company") received a letter from your law firm representing Mr. Richard Levine, a purported shareholder of the Company's, pursuant to Delaware Chancery Court Rule 23.1, demanding that the Company's Board of Directors ("the Board") conduct an investigation.

This letter was received in the Chairman's office on July 21, 2022, and subsequently shared with the Board of Directors. We will provide you with an update in how the Board may respond to this demand in due course.

Best regards,

*Electronically signed by: Jennifer Fox*
*Reason: I approve this document*
*Date: Sep 27, 2022 13:10 EDT*

Jennifer Fox
EVP External Affairs, General Counsel, and Corporate Secretary

# Emergent/Schubert Jonckheer & Kolbe LLP - Demand Response Letter

**Final Audit Report** 2022-09-27

| | |
|---|---|
| Created: | 2022-09-27 |
| By: | Lisa Swinford (SwinfordL@ebsi.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhCVf9sRyKkELxoVAsNeURqbaJNrbhNpY |

## "Emergent/Schubert Jonckheer & Kolbe LLP - Demand Response Letter" History

Document created by Lisa Swinford (SwinfordL@ebsi.com)
2022-09-27 - 3:01:46 PM GMT- IP address: 155.190.22.1

Document emailed to Jennifer Fox (foxj@ebsi.com) for signature
2022-09-27 - 3:02:42 PM GMT

Email viewed by Jennifer Fox (foxj@ebsi.com)
2022-09-27 - 5:09:52 PM GMT- IP address: 155.190.22.1

Document e-signed by Jennifer Fox (foxj@ebsi.com)
Signing reason: I approve this document
Signature Date: 2022-09-27 - 5:10:13 PM GMT - Time Source: server- IP address: 155.190.22.1

Agreement completed.
2022-09-27 - 5:10:13 PM GMT

Exhibit C

**EMERGENT**

December 21, 2022

Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111

**Re**:      Shareholder Demand Pursuant to Del. Ct. Ch. R. 23.1

Dear Mr. Jonckheer,

I write to provide an interim update regarding your demand dated July 20, 2022 pursuant to Delaware Chancery Court Rule 23.1.  Emergent BioSolutions is presently a defendant in a federal securities class action captioned *In re Emergent BioSolutions, Inc. Securities Litigation*, No. 8:21-cv-00955-PWG (D. Md).  Briefing on Defendants' motion to dismiss in that case, which was originally scheduled to be completed by August 18, 2022, is currently on hold pending a ruling from the Court concerning Plaintiffs' Request for Judicial Notice of certain documents, filed on July 19, 2022.

As you note, the Demand concerns the same "subject matter at issue in the Securities Class Action," Demand at 2, namely the Company's public representations regarding its Bayview facility in Baltimore, Maryland, and the events leading to a February 2021 contamination incident at the Bayview facility. It further includes overlapping allegations regarding purported failures of internal controls and insider trading by the Company's officer(s).  As such, a decision on the pending Motion to Dismiss in the securities class action would help to inform the Board's assessment of the issues raised in the Demand, and the Board believes it is prudent to wait for that decision before proceeding further.

Therefore, once the Board of Directors has received and evaluated the Court's decision on the pending dispositive motion, the Board will contact you again concerning the demand.  The Board continues to reserve all rights.

Best regards,

/s/ Jennifer Fox

Jennifer Fox
Senior Vice President, Legal Affairs and Deputy General Counsel
Emergent BioSolutions, Inc.

# Exhibit D

# SCHUBERT JONCKHEER & KOLBE LLP

<span style="font-style:normal">Attorneys at Law</span>

Robert C. Schubert                                      *Of Counsel*
Willem F. Jonckheer                                    Miranda P. Kolbe
Dustin L. Schubert
Noah M. Schubert
—————
Gregory T. Stuart

*VIA EMAIL*

October 4, 2023

Dr. Zsolt Harsanyi, Ph.D.
Chairman of the Board
Emergent BioSolutions Inc.
     c/o Jennifer Fox
     Executive Vice President, External Affairs
     General Counsel and Corporate Secretary
400 Professional Drive, Suite 400
Gaithersburg, MD 20879

     Re:     *Demand on the Board of Directors to Investigate and Initiate Claims*

Dear Dr. Harsanyi:

I write on behalf of Richard J. Levine as Trustee of the Levine/Berenson Trust, a beneficial owner of Emergent BioSolutions Inc. ("Emergent" or the "Company") common stock. Mr. Levine previously served a litigation demand on the Board of Directors on July 20, 2022 concerning the disastrous conditions uncovered at Emergent's Bayview facility in 2021 and the related fallout.

By letter dated December 21, 2022, we were advised that the Board would delay action on the litigation demand pending resolution of the motion to dismiss filed in the federal securities fraud class action litigation captioned *In re Emergent Biosolutions, Inc. Securities Litigation*, No. DLB-21-955 (D. Md.). As you are likely aware, on September 1, 2023, U.S. District Judge Deborah L. Boardman denied the motion to dismiss, sustaining allegations that the defendants, including Robert Kramer, Syed Husain and the Company, made false and misleading statements regarding Emergent's business and operations with scienter, or intent to defraud.

It has been over a month since Judge Boardman's order was issued. We have heard nothing from the Board. Further delay is not acceptable.

It is evident that the Company has actionable claims. Please confirm by no later than October 13, 2023 that the Board will initiate all claims outlined in the litigation demand.

Dr. Zsolt Harsanyi, Ph.D.
October 4, 2023
Page 2 of 2

Very truly yours,

*/s/ Willem F. Jonckheer*

Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP

cc: Timothy J. Perla

Exhibit E

**Subject:**     Shareholder Demand Letter - Emergent
**Date:**         Wednesday, October 11, 2023 at 7:52:32 AM Pacific Daylight Time
**From:**         Willey, Dan
**To:**           Willem F. Jonckheer
**CC:**           Perla, Timothy
**Attachments:** image001.png, image002.png, image003.png, image004.png

Willem,

I am writing to confirm receipt of your letter of October 4th.  This matter is before the board, and we will be in touch.

Best regards,
Dan

**Dan Willey | WilmerHale**
60 State Street
Boston, MA 02109 USA
+1 617 526 6007 (t)
+1 617 526 5000 (f)
dan.willey@wilmerhale.com

**Please consider the environment before printing this email.**

This email message and any attachments are being sent by Wilmer Cutler Pickering Hale and Dorr LLP, are confidential, and may be privileged. If you are not the intended recipient, please notify us immediately—by replying to this message or by sending an email to postmaster@wilmerhale.com—and destroy all copies of this message and any attachments. Thank you.

For more information about WilmerHale, please visit us at http://www.wilmerhale.com.

**From:** Willem F. Jonckheer <wjonckheer@sjk.law>
**Date:** Wednesday, October 4, 2023 at 8:20 PM
**To:** Swinford, Lisa <SwinfordL@ebsi.com>
**Cc:** Perla, Timothy <Timothy.Perla@wilmerhale.com>
**Subject:** Shareholder Demand Letter - Emergent

EXTERNAL SENDER

Please see attached correspondence.

**From:** "Swinford, Lisa" <[SwinfordL@ebsi.com](mailto:SwinfordL@ebsi.com)>
**Date:** Thursday, December 22, 2022 at 2:06 PM
**To:** "Willem F. Jonckheer" <[wjonckheer@sjk.law](mailto:wjonckheer@sjk.law)>
**Subject:** Shareholder Demand Letter

Dear Mr. Jonckheer,

Please see attached. A hard copy was placed in the mail today.

Best,

**Lisa Swinford**
Executive Assistant to
Executive Vice President of External Affairs, General Counsel, and Corporate Secretary

**E** [sw nford @ebs .com](mailto:swnford@ebs.com)

**P** 240-631-3499

**C** 202-760-0181

## EMERGENT

emergentb oso ut ons.com
400 Profess ona  Dr ve, Su te 400, Ga thersburg, MD 20879, Un ted States

  

This e-mail communication (including any attachments) contains information from Emergent BioSolutions or its affiliates that is confidential and may be privileged. The information contained herein is intended only for the use of the addressee(s) named above. If you are not the intended recipient (or the agent responsible to deliver it to the intended recipient), you are hereby notified that any dissemination, distribution, use, or copying of this communication is strictly prohibited. If you have received this e-mail in error, please immediately reply to sender, delete the message and destroy all copies of it. If you have questions, please email [netops@ebsi.com](mailto:netops@ebsi.com). Thank you.

DocuSign Envelope ID: 791AAA88-611F-4E35-A20D-BF3EFBCCC7B2

## <u>VERIFICATION</u>

I, Richard J. Levine, on behalf of the Levine/Berenson Trust, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: October 17, 2023

_____

Richard J. Levine